## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

BLITZ TELECOM CONSULTING, LLC,

      Plaintiff,

v.                                  Case No: 6:14-cv-307-Orl-40GJK

PEERLESS NETWORK, INC.,

      Defendant.

_____

### ORDER

This cause comes before the Court without oral argument on the following:

1. Plaintiff's Motion for Partial Summary Judgment as to Counts III and IV of the Complaint and Supporting Memorandum of Law (Doc. 55), filed May 5, 2015;

2. Defendant's Brief in Opposition to Blitz's Motion for Partial Summary Judgment on Counts III and IV (Doc. 67), filed May 19, 2015;

3. Defendant's Motion and Memorandum in Support of Summary Judgment on Counts I Through IV (Doc. 109), filed September 1, 2015; and

4. Plaintiff's Response in Opposition to Defendant Peerless Network Inc.'s Motion and Memorandum in Support of Summary Judgment on Counts I–IV (Doc. 115), filed September 22, 2015.

## I.    INTRODUCTION

This lawsuit involves a contract dispute between Plaintiff, Blitz Telecom Consulting, LLC ("Blitz"), and Defendant, Peerless Network, Inc. ("Peerless"), over Peerless' alleged nonpayment of co-marketing fees owed to Blitz for telecommunications

traffic Blitz placed on Peerless' network.  To provide context for the parties' dispute, the Court finds it prudent to begin by outlining the general framework of how telecommunications services—most pertinently, telephone services—are provided and paid for in the United States.

Fundamentally, there are two types of telephone traffic: local and long-distance. When a customer wishes to complete a local telephone call, the customer begins by dialing the call through his "originating" local exchange carrier ("LEC") (i.e., AT&T, Sprint, BellSouth, etc.).  The originating LEC then transmits the call to the call recipient's "terminating" LEC.  The terminating LEC ultimately connects the call to its recipient.  In the case of a local call, the originating LEC's customer pays the originating LEC for initiating the call and the originating LEC pays the terminating LEC for completing the call.[1]  This compensation structure is termed "reciprocal compensation."  *In re Implementation of the Local Competition Provisions in the Telecomms. Act of 1996*, 11 FCC Rcd. 15499, ¶ 1034 (1996); 47 U.S.C. § 251(b)(5).[2]

When a customer wishes to complete a long-distance call, the customer again begins by dialing the call through his originating LEC.  The originating LEC then collaborates with a long-distance interexchange carrier ("IXC") which facilitates transmission of the call by carrying the call on its own network until it reaches the call recipient's terminating LEC.  The terminating LEC then connects the call to its recipient. Instead of reciprocal compensation, the LECs involved in a long-distance call assess an

---

[1]  In reality, calls are transmitted among several LECs before reaching the terminating LEC.  In this circumstance, the originating LEC is responsible for paying all subsequent LECs involved in transmitting the call.

[2]  The Federal Communications Commission ("FCC") is responsible for regulating the telecommunications industry.  *See* 47 U.S.C. §§ 151, 154(i).

"access charge" to the IXC for the privilege of using the LECs' physical facilities to connect the call. The originating LEC's customer pays the IXC directly for its services, which in turn pays the access charges imposed by the LECs. *Implementation of Local Competition Provisions*, 11 FCC Rcd. 15499, ¶ 1035; *see also* 47 C.F.R. §§ 69.1–69.5.

Where problems are beginning to emerge is with the use of prepaid calling cards to complete long-distance calls. Ordinarily, a customer who wants to make a call with a prepaid calling card begins by dialing a toll-free or an out-of-area "access number" through his originating LEC. This access number allows the customer to reach the calling card service provider's centralized switching platform. The switching platform then transmits the call to the intended recipient. Similar to a long-distance call, the originating LEC recognizes the access number as a long-distance number and assesses an access charge to the calling card service provider. The calling card service provider debits against the balance of the customer's prepaid calling card and pays the access charge imposed by the originating LEC. *In re Regulation of Prepaid Calling Card Servs.*, 21 FCC Rcd. 7290, ¶ 2 (2006); *In re AT&T Corp. Petition for Declaratory Ruling Regarding Enhanced Prepaid Calling Card Servs.*, 20 FCC Rcd. 4826, ¶¶ 3–5 (2005).

Increasingly, prepaid calling card companies are issuing prepaid calling cards bearing access numbers within customers' local calling areas. For example, such a prepaid calling card purchased by a customer in Miami, Florida would require the customer to dial an access number with a 305 area code. Because the access number is local, the originating LEC through which the customer initiates his long-distance call views the call as local; the originating LEC therefore transmits the call to the access number's LEC as if it will act as the terminating LEC for a local call. However, the access

number's LEC is actually a switching platform operated by the calling card service provider.  The calling card service provider then transmits the call as a long-distance call to the intended recipient.  Because the originating LEC only recognizes the call as a local call, the originating LEC—expecting to be paid under the reciprocal compensation structure—never assesses an access charge to the calling card service provider.  The result is that the calling card service provider debits against the balance of the customer's prepaid calling card at the same rate, but never pays any fees to which the originating LEC would normally be entitled had the access number been a toll-free or an out-of-area number.

Understandably, originating LECs have sued to recover the avoided access charges.  *See, e.g.*, *Broadvox-CLEC, LLC v. AT & T Corp.*, 98 F. Supp. 3d 839 (D. Md. 2015); *Dollar Phone Access, Inc. v. AT & T Inc.*, No. 14-CV-3240 (SLT)(LB), 2015 WL 430286, at *1–3 (E.D.N.Y. Feb. 2, 2015).  One such lawsuit, *Southwestern Bell Telephone Co. v. IDT Telecom, Inc.*, No. 3:09-CV-01268-P (N.D. Tex. Mar. 9, 2012) (hereinafter referred to as the "*IDT* Decision"), finds itself as the focal point of the instant litigation.  Initiated in a Texas federal district court, the *IDT* Decision involved a number of LECs who sought to recover the value of access charges avoided by prepaid calling card service providers.  *Id.* at 2–4.  In granting partial summary judgment in favor of the LECs on the issue of liability, the *IDT* Decision held that all prepaid calling card traffic— no matter where a call originates or terminates—is subject to access charges which must be paid by the service provider.  *Id.* at 9–13.  The case subsequently settled on the issue of damages.  *See Dollar Phone*, 2015 WL 430286, at *3.  As will be revealed shortly, Peerless relies heavily on the *IDT* Decision to justify its actions in this case.

## II.    BACKGROUND

### A.    Facts

Blitz' business involves purchasing telephone numbers from various telecommunications carriers (such as LECs and IXCs) and subsequently marketing and reselling those numbers in bulk, along with other associated services, to companies and telecommunications carriers who offer telephone services to end consumers at a discounted price.  (Doc. 55-1, ¶¶ 4–6).  Many, but not all, of the companies to which Blitz resells these telephone numbers are prepaid calling card service providers.  (*Id.* ¶ 4).  Peerless is a telecommunications carrier whose subsidiaries provide local exchange and interexchange telephone services.  (Doc. 67-1, ¶ 2).

On November 9, 2010, Blitz and Peerless entered into an IP Control Agreement (the "Contract")[3] whereby Peerless agreed to assign telephone numbers to Blitz for a fee. (Contract § 3.5; Contract App. A, p. 1).  The Contract contemplates that Blitz would then use these numbers to place traffic on Peerless' network either by selling the numbers in bulk to other carriers and prepaid calling card providers, or by originating the traffic itself. (Contract §§ 3.5, 7.4; Doc. 55-1, ¶ 8; Doc. 67-1, ¶ 4).  In exchange, Peerless agreed to pay a 30% commission to Blitz each month.  (Contract App. A § 1.1).  This commission, referred to as the "co-marketing fee," was calculated based on revenues Peerless collected from certain charges it imposed on the customers and carriers whose traffic Blitz brought to Peerless' network.  (*Id.*).

From 2010 through approximately May or June 2012, Peerless accounted for and paid the monthly co-marketing fees to Blitz.  (Doc. 55-1, ¶ 9; Doc. 67-1, ¶ 9).  However,

---

[3]    The Contract is located at Docket Entry 1-1, Exhibit A.

on April 11, 2012, Peerless notified Blitz by mail that it would no longer remit co-marketing fees to Blitz because of the *IDT* Decision, which became a final order on April 9, 2012. (Doc. 55-3).  In its letter to Blitz, Peerless asserted that it was entitled to modify the parties' agreement pursuant to Section 23 of the Contract, which provides, in pertinent part, as follows:

> In the event of (a) any legislative, regulatory, Judical [sic] or other legal action that materially affects the ability of a Party to perform any material obligation under this Agreement, or (b) any FCC rule, or (c) the enactment or amendment to any applicable Commission rule, Service Guideline, or Commission order or arbitration award purporting to apply the provisions of the Act (individually and collectively "Change in Law"), either Party may, on thirty (30) days' written notice to the other Party . . . , require that the affected provision(s) be renegotiated, or that new terms and conditions be added to this Agreement, if applicable.

(Contract § 23) (hereinafter referred to as the "Change in Law" provision).  It was, and remains, Peerless' contention that the *IDT* Decision constitutes a Change in Law that materially affected its ability to perform a material obligation under the Contract, thus authorizing Peerless to cease paying Blitz co-marketing fees.  Blitz disagrees, and the instant litigation ensued.

## B.  Procedural History

Blitz initiated this action on February 24, 2014 by filing a Complaint which alleges four claims for relief: breach of contract, quantum meruit, declaratory judgment, and equitable accounting.  (Doc. 1).  On January 5, 2015, Peerless filed its Amended Answer and Affirmative Defenses.  (Doc. 30).  Peerless additionally alleges two counterclaims against Blitz for breach of contract and quantum meruit arising out of Blitz' alleged nonpayment for services provided by Peerless under the Contract.  (*Id.* at pp. 21–26).

Blitz now moves for summary judgment on Counts III and IV of its Complaint and Peerless moves for summary judgment on all four of Blitz' claims.

## III.   STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" to support its position that it is entitled to summary judgment. Fed. R. Civ. P. 56(c)(1)(A). "The court need consider only the cited materials," but may also consider any other material in the record. Fed. R. Civ. P. 56(c)(3).

An issue of fact is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law. *Id.* The moving party bears the initial burden of identifying those portions of the record demonstrating a lack of genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004). If the movant shows "an absence of evidence to support the nonmoving party's case," the burden then shifts to the non-moving party to demonstrate that there are, in fact, genuine disputes of material facts. *Celotex*, 477 U.S. at 325; *see also Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006), *cert. denied*, 549 U.S. 996 (2006).

To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.,*

*Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the non-movant must go beyond the pleadings and "come forward with specific facts showing that there is a genuine issue for trial." *Id.* at 587 (emphasis and internal quotation marks omitted); *see also Crawford-El v. Britton*, 523 U.S. 574, 600 (1998) (holding that a non-movant carries its burden on summary judgment only by "identify[ing] affirmative evidence" which creates a genuine dispute of material fact).

In determining whether a genuine dispute of material fact exists, the Court must read the evidence and draw all factual inferences therefrom in the light most favorable to the non-moving party and must resolve any reasonable doubts in the non-movant's favor. *Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1136 (11th Cir. 2007). Summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita*, 475 U.S. at 587.

## IV.   DISCUSSION

Blitz moves for summary judgment on Counts III and IV of its Complaint, which allege claims for declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and for equitable accounting, respectively. Peerless moves for summary judgment on all four of Blitz' claims. The Court addresses the parties' arguments in the most logical order.

### A.   Applicable Law

As a preliminary matter, the Court must determine the applicable law for each claim. A federal court sitting in diversity applies the substantive law of the state in which it sits. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). The Court will therefore apply Florida law to Blitz' quantum meruit and equitable accounting claims. However, due to a

choice of law provision contained within the Contract, the Court will apply Illinois law to Blitz' breach of contract claim.  (Contract § 12).

Regarding Blitz' declaratory judgment claim, the *Erie* Doctrine also requires a federal court sitting in diversity to apply the substantive law of the state in which it sits to substantive issues raised in a claim brought pursuant to the Declaratory Judgment Act. *Commercial Union Ins. Co. v. Walbrook Ins. Co.*, 41 F.3d 764, 772–73 (1st Cir. 1994). Notwithstanding, where a contractual choice of law provision governs a substantive issue, the Court applies the substantive law chosen by the parties.  Thus, the Court will apply Illinois substantive law to the extent Blitz seeks declaratory relief relative to its breach of contract claim and Florida substantive law to the extent Blitz seeks declaratory relief relative to its quantum meruit and equitable accounting claims.

B.       **Whether the *IDT* Decision Changed Telecommunications Law**

The crux of Blitz' breach of contract, quantum meruit, and declaratory judgment claims is whether Peerless breached the Contract by failing to pay co-marketing fees.  To that end, Peerless moves for summary judgment on the narrow issue of whether the *IDT* Decision represents "a material change in telecommunications law."  (Doc. 109, pp. 11, 17).    Peerless contends that it does, arguing that the *IDT* Decision changed telecommunications law by holding that prepaid calling card service providers are responsible for paying access charges assessed on calls made through prepaid calling cards, regardless of the routing of the call or where the call originated.  In that instance, Peerless asserts that it would no longer be obligated to pay Blitz the co-marketing fees. (*Id.* at pp. 14–17).

However, it is not possible for the *IDT* Decision to constitute a change in federal telecommunications law, as district courts "lack authority to render precedential decisions" that would bind other parties, other courts, or other judges. *Am. Elec. Power Co. v. Connecticut*, 131 S. Ct. 2527, 2540 (2011).   Indeed, a district court's power is limited solely to adjudicating the issues before it, binding only those who are parties to the lawsuit. *See id.*  It is undisputed that the *IDT* Decision was rendered by a federal district court in the Northern District of Texas and has not been confirmed or adopted by either the FCC or any court having the authority to create binding precedent on the parties to this lawsuit.  To the extent the *IDT* Decision could be construed as changing, modifying, adding to, or departing from the state of telecommunications law, it only did so relative to the parties of that particular lawsuit.  The *IDT* Decision therefore is not "a material change in telecommunications law," and Peerless will be denied summary judgment on that issue.

## C.   Peerless' Motion for Summary Judgment on Count III

Next, the Court examines Peerless' motion for summary judgment as it relates to Blitz' declaratory judgment claim.  (Doc. 109, pp. 6–8).  Peerless raises two threshold issues which it insists preclude the Court from granting the declaratory relief Blitz seeks. First, Peerless asserts that no actual controversy exists between the parties.  Second, Peerless contends that the declaratory relief Blitz seeks is duplicative of the relief requested in its breach of contract and quantum meruit claims.

The Declaratory Judgment Act grants to the federal district courts the power to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201.  An essential element for a declaratory judgment action is the existence of an "actual

controversy" between the parties, a term which holds the same meaning as the cases and controversies requirement of Article III to the United States Constitution. *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 239–40 (1937).  In that sense, an "actual controversy" exists where "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941).  Ordinarily, a controversy is not sufficiently immediate or real where the parties' dispute is only hypothetical and not yet ripe, has been rendered moot, or where the court's resolution of the matter would be purely academic.  *See Aetna Life Ins. Co.*, 300 U.S. at 240–41; *Texas v. United States*, 523 U.S. 296, 300 (1998).

Peerless claims that there is no actual controversy in this case because the Contract has been terminated and the parties have since entered into a new agreement which does not contain the provision in dispute here.  However, the fact that the Contract is no longer in effect does not render the parties' case moot or hypothetical as Peerless seems to suggest.  To the contrary, the parties hotly contest their rights and remedies under the Contract and the significance of the *IDT* Decision relative to those rights and remedies.  The issues raised in this case are undoubtedly ripe and form an active controversy.

As to whether Blitz' declaratory judgment claim is duplicative of other claims it alleges, this is not a basis for denying declaratory relief.  It is well-established that "[t]he existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate." Fed. R. Civ. P. 57.  To be sure, declaratory relief may be awarded cumulatively to other relief which provides the same remedy.  *See Powell v. McCormack*,

395 U.S. 486, 518 (1969) ("[A] request for declaratory relief may be considered independently of whether other forms of relief are appropriate."). Accordingly, Peerless will be denied summary judgment on these grounds.

### D.   Blitz' Motion for Summary Judgment on Count III

Blitz also moves for summary judgment on its declaratory judgment claim. (Doc. 55, pp. 10–22). As stated above, the Declaratory Judgment Act allows a district court to declare the legal rights and obligations of parties to an actual controversy. Although the power to render a declaratory judgment is discretionary, a court should have a good reason for declining to consider a declaratory judgment claim. *See Angora Enters., Inc. v. Condo. Ass'n of Lakeside Vill., Inc.*, 796 F.2d 384, 387 (11th Cir. 1986) (per curiam). Indeed, courts should confront the merits of a declaratory judgment claim if declaratory relief would (1) "serve a useful purpose in clarifying and settling the legal relations in issue," and (2) "terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 594 (4th Cir. 2004); *accord Allstate Ins. Co. v. Emp'rs Liab. Assurance Corp.*, 445 F.2d 1278, 1280 (5th Cir. 1971).[4] The Court finds that both of these considerations would be served by addressing one of the declarations Blitz requests in Count III:[5]

> That the authority upon which Peerless relies for its invocation
> of the "Changes of Law" provision of the Contract do[es] not

---

[4] In *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit that were handed down prior to October 1, 1981.

[5] To the extent Blitz requests other declaratory relief in its Complaint or in its motion for summary judgment, the Court declines to reach these declarations, finding that none would serve a useful purpose. *See Allstate*, 445 F.2d at 1280.

> warrant invocation of that provision, and do[es] not authorize
> Peerless to renegotiate or modify the Contract.

(Doc. 1, p. 10).

Blitz argues that the *IDT* Decision which Peerless cites as justification for modifying the Contract is insufficient to invoke the Contract's Change in Law provision.  (Doc. 55, pp. 12–21).  In support, Blitz points to the plain language of the Change in Law provision itself, which allows any party to the Contract to renegotiate or modify the terms of the Contract where "any legislative, regulatory, Judical [sic] or other legal action . . . materially affects the ability of a Party to perform any material obligation under this Agreement." (Contract § 23).  Blitz maintains that not only did the *IDT* Decision not constitute a change in telecommunications law, the ruling did not affect any "material obligation" owed by Peerless under the Contract in that the *IDT* Decision did not alter Peerless' duty to pay co-marketing fees on the revenues it collected.  Blitz therefore concludes that the *IDT* Decision provided no authority for Peerless to stop paying the contractually required commissions.

Despite the Court's conclusion above that the *IDT* Decision does not constitute "a material change in telecommunications law," the question Blitz asks in its motion for summary judgment is much different than the question Peerless asked in its motion and answered by the Court in Section IV.B, *supra*.  Where Peerless asked a question of legal interpretation, Blitz now asks a question of contract interpretation—that is, does the *IDT* Decision constitute a "Change in Law" according to the terms of the Contract?

In interpreting and applying the Contract to the instant dispute, the Court's first inquiry is whether the Change in Law provision is ambiguous, which is resolved as a matter of law.  *Berryman Transfer & Storage Co. v. New Prime, Inc.*, 802 N.E.2d 1285,

1287 (Ill. App. Ct. 2004).  A contract is ambiguous "when the language used is susceptible to more than one meaning or is obscure in meaning through indefiniteness of expression." *Shields Pork Plus, Inc. v. Swiss Valley Ag Serv.*, 767 N.E.2d 945, 949 (Ill. App. Ct. 2002) (citations omitted).  On the other hand, a contract is unambiguous where the court is able to discern the parties' intent from the plain and obvious meaning of the contract's language.  *MXL Indus., Inc. v. Mulder*, 623 N.E.2d 369, 376–77 (Ill. App. Ct. 1993).  A contract is not ambiguous simply because a party urges that it is.  *See Paris-Custardo v. Great Am. Ins. Co. of N.Y.*, 844 N.E.2d 1011, 1014 (Ill. App. Ct. 2006).  Rather, a contract is ambiguous only where a party shows that its language is reasonably and fairly susceptible to more than one meaning.  *Paul B. Episcope, Ltd. v. Law Offices of Campbell & Di Vincenzo*, 869 N.E.2d 784, 789 (Ill. App. Ct. 2007).  If a contract is found to be ambiguous, its proper interpretation is a question of fact reserved for the jury.  *Shields Pork*, 767 N.E.2d at 949.  However, where a contract is unambiguous, the court simply enforces the parties' intent based on the plain and obvious meaning of the words used.  *MXL Indus.*, 623 N.E.2d at 376–77.

Here, the Court finds that the Change in Law provision is unambiguous.  That provision defines "Change in Law" to mean "any legislative, regulatory, Judical [sic] or other legal action that materially affects the ability of a Party to perform any material obligation under this Agreement."  (Contract § 23).  Although Peerless contends that the word "material" is ambiguous (Doc. 67, pp. 11–12), Peerless does not disclose its interpretation of the word, and the Court does not find that the word is reasonably capable of holding more than one meaning based on the context of the Contract.  The Court therefore applies the word's plain and obvious meaning: "[o]f such a nature that

knowledge of the item would affect a person's decision-making; significant; essential." *See Material (adj.)*, Black's Law Dictionary (10th ed. 2014).  Accordingly, three elements must be satisfied for a party to the Contract to establish a "Change in Law": (1) a legislative, regulatory, judicial, or other legal action (2) that materially affects (3) any material obligation under the Contract.  Applying the plain meaning of the word "material," both the effect of and the obligation affected by the asserted judicial or legal action must be significant or essential to the Contract.

There is no genuine dispute that the *IDT* Decision did not impact "any material obligation" owed by Peerless under the Contract.  Blitz shows that the relevant obligation in this lawsuit is Peerless' agreement to "pay a co-marketing fee at the stated commission structure of 30% to [Blitz] based on collected revenues on InterLata CABS (carrier access billing) charges for Interstate and Intrastate traffic terminating to or associated with the local telephone numbers comprising a component of the Service provided to [Blitz]." (Contract App. A § 1.1).  Blitz' position is that the *IDT* Decision had nothing to do with the payment of co-marketing fees in the telecommunications industry and, consequently, never affected Peerless' ability to pay co-marketing fees under the Contract.

In response, Peerless tries to claim that its obligation to pay co-marketing fees to Blitz was materially affected in that the *IDT* Decision hindered Peerless' ability to collect revenues from the traffic Blitz placed on Peerless' network.  (Doc. 67, pp. 13–17; *see also* Doc. 109, pp. 11–17).  Peerless shows that, since the *IDT* Decision, some carriers that transmitted Blitz prepaid calling card traffic have refused to pay Peerless for its services or have demanded that Peerless refund amounts previously paid.  (Doc. 67-1, ¶¶ 15–17).  According to Peerless' President and CEO, John Barnicle, the result has been that

Peerless was collecting only 16% of the revenues it collected prior to the *IDT* Decision. (*Id.* ¶ 18).  Peerless concludes that since its ability to collect has been affected by the *IDT* Decision, so has its obligation to pay co-marketing fees to Blitz.

However, Peerless' logic does not follow.  The unambiguous language of the Contract does not require Peerless to collect revenues based on the traffic Blitz placed, but to *pay* co-marketing fees to Blitz based on the traffic Blitz placed.  (Contract App. A § 1.1).  The collection of revenues is merely the yardstick by which Peerless measures the co-marketing fees it pays.  By the terms of the parties' bargained-for agreement, if Peerless collected no revenues from Blitz' traffic in a given month, then it would not pay a co-marketing fee to Blitz for that month and would not be in breach of the Contract.  Further, the parties' intent regarding Peerless' payment of co-marketing fees is clarified in a subsequent provision, which reads, "The intention of this section is that Peerless pays [Blitz] *only on collected revenues*," leading to the conclusion that the parties clearly contemplated that Peerless would pay co-marketing fees to Blitz in proportion to the value of revenues collected.  (Contract App. A § 1.3) (emphasis added).  Indeed, Peerless' own admission is that it still collected on Blitz traffic after the *IDT* Decision, it just happened that the value of revenues collected was significantly less than what Peerless desired.  (*See* Doc 67-1, ¶ 18).  Simply because Peerless became disenchanted with the value of revenues it collected from third parties after the *IDT* Decision—and consequently the amount Peerless retained for itself under the Contract—did not mean that its ability to pay Blitz based on these revenues was affected in any way.

In the same vein, Peerless also attempts to raise a genuine factual dispute by asserting that the *IDT* Decision frustrated its purpose in entering into the Contract.

Because Peerless was collecting only a fraction of the revenues it anticipated when it executed the Contract with Blitz, Peerless submits that it must be excused from paying the co-marketing fees.   (Doc. 67, pp. 17–20).   Under Illinois law, the doctrine of commercial frustration is an extension of the defense of impossibility and excuses nonperformance of a contractual obligation where there is an unforeseeable event which renders the value of a party's performance completely or almost completely meaningless. *Illinois-American Water Co. v. City of Peoria*, 774 N.E.2d 383, 390–91 (Ill. App. Ct. 2002). However, Peerless raised neither commercial frustration nor impossibility as affirmative defenses to this lawsuit.   (*See* Doc. 30, pp. 19–21).   These defenses are therefore not properly before the Court on summary judgment.   *Cf. Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314–15 (11th Cir. 2004) (per curiam) (holding that a non-movant may not avoid summary judgment by raising a claim for the first time in its summary judgment brief).[6]

Since Peerless fails to genuinely dispute that the *IDT* Decision did not impact any significant or essential obligation owed under the Contract, Peerless cannot rely on the *IDT* Decision as authority to invoke the Change in Law provision.  The Court will partially grant summary judgment in Blitz' favor on Count III and issue the requested decree.

### E.   Count IV: Equitable Accounting

Both parties move for summary judgment on Blitz' equitable accounting claim, in which Blitz requests that an auditor be appointed to examine the parties' accounts and determine the amount due and owing by Peerless under the terms of the Contract.

---

[6]   The parties shall not construe the Court's finding that the defenses of commercial frustration and impossibility are unavailable to Peerless on summary judgment as a finding that Peerless has waived or forfeited these defenses.

(Doc. 1, p. 11).   In its motion, Peerless maintains that Blitz fails to state a claim for equitable accounting because there is no fiduciary relationship between the parties, there is an adequate remedy at law, and the questioned transactions are not sufficiently complex to warrant an accounting.   (Doc. 109, pp. 9–10).   Blitz moves for summary judgment for opposite reasons, affirming that an equitable accounting is necessary to determine the value of co-marketing fees owed by Peerless under the Contract.   (Doc. 55, p. 9).

To begin, "an accounting is best understood as a *remedy* for a cause of action, not as a cause of action in its own right."  *Zaki Kulaibee Establishment v. McFliker*, 771 F.3d 1301, 1310 & n.21 (11th Cir. 2014).   To be entitled to an equitable accounting, "a party must show either (1) a sufficiently complicated transaction and an inadequate remedy at law or (2) the existence of a fiduciary relationship."  *Id.* at 1311.   Peerless states that the disputed transactions, although voluminous, are relatively straightforward and are calculable by the terms of the Contract.   Peerless also suggests that Blitz has an adequate remedy at law in the form of a monetary judgment on its breach of contract claim.   Finally, Peerless shows that the Contract explicitly disavows any fiduciary relationship between the parties.   (Contract § 10).   Accordingly, Peerless carries its initial burden on summary judgment of demonstrating that Blitz is not entitled to the equitable accounting remedy.

In response, however, Blitz raises genuine factual disputes as to whether the transactions are sufficiently complicated and whether it has an adequate remedy at law. Accounts are sufficiently complicated to warrant an equitable accounting when a jury would not be reasonably able, based on the time and effort required, to assess the evidence and reach an accurate value of the amount owed.  *See Managed Care*

*Solutions, Inc. v. Essent Healthcare, Inc.*, 694 F. Supp. 2d 1275, 1279–81 (S.D. Fla. 2010). Blitz shows that an accurate calculation of the co-marketing fees Peerless allegedly owes would involve verifying call records for the traffic Blitz placed on Peerless' network, reviewing 85,000 invoices (each of which is over 100 pages in length), and reconciling revenues Peerless refunded to certain companies that disputed whether they owed money to Peerless based on the *IDT* Decision. (Doc. 115-6, 26:2–16, 39:19–40:2, 64:24–65:2). These tasks are certainly "beyond the ken of [a] jury trial." *Managed Care*, 694 F. Supp. 2d at 1281 (quoting *Huebener v. Chinn*, 207 P.2d 1136, 1148 (Or. 1949)).

Moreover, Blitz shows that a judgment on its breach of contract claim may not be obtainable without an accounting, thus precluding an adequate remedy at law. Blitz contends that Peerless has been dilatory and evasive in discovery, especially in producing evidence which would allow Blitz to calculate the co-marketing fees allegedly owed by Peerless. (Doc. 115, p. 9). In order to prevail on a breach of contract claim under Illinois law, Blitz will be required, in part, to prove that it has incurred damages and that these damages are reasonably measurable and not merely speculative. *Kirkpatrick v. Strosberg*, 894 N.E.2d 781, 792 (Ill. App. Ct. 2008). Without a sufficient accounting, Blitz shows that its damages might be too nebulous to sustain a judgment for breach of contract, leaving Blitz without a remedy at law. For these reasons, Blitz establishes a genuine dispute that the transactions at issue are sufficiently complicated and that Blitz lacks an adequate remedy at law.

Peerless' motion for summary judgment will be granted as to Count IV to the extent Blitz attempts to state a claim for equitable accounting, as accounting is not a claim for relief. *Zaki*, 771 F.3d at 1310 & n.21. Count IV will therefore be dismissed and Blitz'

motion for summary judgment on Count IV will be denied.  However, Peerless' motion will be denied to the extent Peerless seeks to preclude the availability of equitable accounting as a remedy in this case.  The Court may order an accounting, if appropriate, upon a finding of liability on Blitz' breach of contract or quantum meruit claims.

### F.  Illegality of the Contract

Lastly, Peerless ends its motion for summary judgment by claiming that the Contract is illegal and contrary to public policy.  (Doc. 109, pp. 17–24).  Peerless suggests that the Contract requires Blitz to provide telecommunications services and that Blitz' failure to comply with the FCC's regulatory requirements for telecommunications carriers means that Blitz performed the Contract illegally.  As a result, Peerless concludes that the Contract is void and unenforceable.

"Illinois law provides a defense to the enforcement of a contract if that contract is illegal either as a matter of Illinois or Federal law."  *Kim v. Citigroup, Inc.*, 856 N.E.2d 639, 647 (Ill. App. Ct. 2006) (internal quotation marks omitted).  A contract is illegal only if the conduct it contemplates is "clearly contrary to what the constitution, statutes or court decisions have declared," or if it is "manifestly injurious to the public welfare."  *Swavely v. Freeway Ford Truck Sales, Inc.*, 700 N.E.2d 181, 187 (Ill. App. Ct. 1998).  The determination of whether a contract is illegal is a question of law.  *Id.*

All telecommunications carriers must obtain certification from the FCC before providing telecommunications services.  47 U.S.C. § 214.  Peerless argues that Blitz is, in fact, a telecommunications carrier and that Blitz' failure to obtain the mandated certification renders the Contract and Blitz' performance thereof illegal.  Blitz vehemently denies that it is a telecommunications carrier subject to FCC certification.

The FCC defines "telecommunications carrier" as "any provider of telecommunications services, except that such term does not include aggregators of telecommunications services."  47 U.S.C. § 153(51).  It is understood that "telecommunications service" means telecommunications that are provided on a common carrier basis.  *V.I. Tel. Corp. v. FCC*, 198 F.3d 921, 926–27 (D.C. Cir. 1999).  Therefore, to be a "telecommunications carrier" requiring certification by the FCC, Blitz must provide telecommunications on a common carrier basis.

A "common carrier" is "any person engaged as a common carrier for hire." 47 U.S.C. § 153(11).  Due to the lack of instruction afforded by this definition, the FCC has adopted a two-prong test for determining whether an entity is a common carrier.  First, a common carrier "undertak[es] to carry for all people indifferently."  *Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC*, 533 F.2d 601, 608 (D.C. Cir. 1976) (internal quotation marks omitted).  In other words, an entity is a common carrier if it is either legally compelled to serve all persons who desire to use its services or, if by the entity's very nature, it holds itself out as serving all who desire to use its services.  *Id.*; *see also Time Warner Cable Info. Servs. (N.C.), LLC v. Duncan*, 656 F. Supp. 2d 565, 573 (E.D.N.C. 2009) ("[T]he primary sine qua non of common carrier status is a quasi-public character . . . .").  "[A] carrier will not be a common carrier where its practice is to make individualized decisions" as to whom it will render services.  *Nat'l Ass'n of Regulatory Util. Comm'rs*, 533 F.2d at 608–09.

As to this first prong, Peerless fails to carry its burden on summary judgment. Although Peerless goes to great lengths to explain why it believes Blitz is a telecommunications carrier, the evidence relied on reveals to the contrary.  Peerless

primarily points to the Contract itself, which contemplates that Blitz will resell Peerless' telecommunications services to Blitz' own customers.  However, a closer look at the contractual language Peerless cites shows that the management and resale of the telephone numbers assigned to Blitz by Peerless are Blitz' exclusive responsibility. (Contract §§ 3.7, 6.1).  In other words, Blitz chooses to whom it will resell Peerless' services, an indication that Blitz is not a common carrier.  *See Nat'l Ass'n of Regulatory Util. Comm'rs*, 533 F.2d at 608–09.  Further, Peerless refers to a presentation Blitz made to a potential client in order to market its services.  (Doc. 109-9).  Again, however, this presentation only corroborates that Blitz selects to whom it sells.  Peerless ultimately puts forth no affirmative evidence supporting the conclusion that Blitz "undertakes to carry for all people indifferently."  Peerless therefore cannot establish that Blitz is a telecommunications carrier and is not entitled to summary judgment on the grounds that the Contract is illegal.[7]

## V.    CONCLUSION

For the aforementioned reasons, it is **ORDERED AND ADJUDGED**:

1. Plaintiff's Motion for Partial Summary Judgment as to Counts III and IV of the Complaint (Doc. 55) is **GRANTED IN PART** and **DENIED IN PART** as follows:

   a. Plaintiff's Motion for Partial Summary Judgment is **GRANTED IN PART** as to Count III.  The Court **DECREES** that the *IDT* Decision

---

[7]   Because Peerless fails to make a sufficient showing on the first prong of the FCC's common carrier test, the Court declines to examine the second prong: that all customers who use Blitz' services are permitted to "transmit intelligence of their own design and choosing."  *Nat'l Ass'n of Regulatory Util. Comm'rs*, 533 F.2d at 609.

did not warrant Defendant's invocation of the Contract's Changes in Law provision and did not authorize Defendant to renegotiate or modify the Contract.

    b. Plaintiff's Motion for Partial Summary Judgment is **DENIED** as to Count IV.

2. Defendant's Motion for Summary Judgment on Counts I Through IV (Doc. 109) is **GRANTED IN PART** and **DENIED IN PART** as follows:

    a. Defendant's Motion for Summary Judgment is **GRANTED** to the extent Count IV attempts to state a claim for equitable accounting. Count IV is **DISMISSED**.[8]

    b. Defendant's Motion for Summary Judgment is otherwise **DENIED**.

**DONE AND ORDERED** in Orlando, Florida on December 21, 2015.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record

---

[8] As explained in Section IV.E of this Order, the equitable accounting remedy remains available to Blitz.